1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                         WESTERN DISTRICT OF WASHINGTON
9                                    AT TACOMA

10    ESTATE OF STEPHEN
      CUNNINGHAM, PHIL                        CASE NO. 3:16-CV-05835-DWC
11    CUNNINGHAM,
                                              ORDER ON DEFENDANTS' MOTION
12                    Plaintiffs,             FOR SUMMARY JUDGMENT

13          v.

14    CITY OF TACOMA, JIMMY WELSH,
      PATRICK PATTERSON, OFFICERS
15    JOHN OR JANE DOE 1-5,

16                    Defendants.

17          Pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and Local Rule MJR

18    13, the parties have consented to have this matter heard by the undersigned Magistrate Judge.

19    Dkt. 9. Currently before the Court is Defendants City of Tacoma, Jimmy Welsh, and Patrick

20    Patterson's Motion for Summary Judgment ("Motion"). Dkt. 18.

21          The Court concludes Plaintiffs, the Estate of Stephen Cunningham and Phil Cunningham,

22    have failed to rebut Defendants' summary judgment showing. Accordingly, the Court grants the

23

24

1  Motion. Additionally, the Court dismisses the Doe defendants due to Plaintiffs' failure to

2  prosecute.  Accordingly, this case is closed.

3  **I.     BACKGROUND**

4        Plaintiffs bring this civil action under 42 U.S.C. § 1983 challenging the actions of

5  Defendants City of Tacoma, Welsh, and Patterson during a police-involved shooting. *See* Dkt. 1-

6  1. Plaintiffs allege Defendants City of Tacoma and Welsh, a police officer with the Tacoma

7  Police Department, violated Stephen Cunningham's ("Stephen") constitutional rights when

8  Defendant Welsh shot and killed Stephen. *Id*. Plaintiffs also contend Defendants City of Tacoma

9  and Patterson violated Phil Cunningham's ("Phil") constitutional rights when Defendant

10 Patterson searched Phil's home without a warrant. *Id*.

11        Defendants filed the Motion with supporting evidence on January 1, 2018. Dkt. 18-23.

12 Plaintiffs filed a Response with supporting evidence on February 5, 2018. Dkt. 27-35.

13 Defendants filed a Reply and two additional affidavits on February 9, 2018. Dkt. 36-38. The

14 parties did not request oral argument. *See* Dkt. 18, 27. Regardless, the Court has reviewed the

15 record and independently determined oral argument is not necessary in this case.

16 **II.     STANDARD OF REVIEW**

17        Summary judgment is proper only if the pleadings, discovery, and disclosure materials on

18 file, and any affidavits, show that there is no genuine dispute as to any material fact and that the

19 movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is

20 entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

21 showing on an essential element of a claim in the case on which the nonmoving party has the

22 burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of

23 fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for

24

the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

### III.    EVIDENCE

The relevant evidence shows Defendant Welsh, a police officer with the Tacoma Police Department, was on patrol on the evening of May 10, 2015. *See* Dkt. 20, Welsh Dec., ¶¶ 2-3. Defendant Welsh was a "single officer," meaning he was the only officer in his patrol car. *See* Dkt. 20, p. 13. At approximately 10:00 p.m., Defendant Welsh and non-party Officer Angela Hayes, a police officer with the Tacoma Police Department who was driving a separate patrol car, were dispatched to investigate a noise complaint in the area of 3424 South Proctor Street, Tacoma, Washington. *Id.*; Dkt. 20, Welsh Dec., ¶ 4. The officers responded to the complainant's location and spoke with Angela Sprinkle, the complainant. Dkt. 20, Welsh Dec., ¶ 5; Dkt. 31, Sprinkle Dec., ¶¶ 2-5; Dkt. 20, p. 13. Defendant Welsh stated he could hear the music from inside Ms. Sprinkle's home and the officers advised Ms. Sprinkle that they would make contact with the neighbor and ask the neighbor to turn the music down. Dkt. 20, Welsh Dec., ¶ 5; Dkt. 20, p. 13.

Defendant Welsh and Officer Hayes "walked to the house that was playing music." Dkt. 20, Welsh Dec., ¶ 6. At the time Defendant Welsh initially made contact at the residence, it was a very simple call to request the music be turned down. Dkt. 20, p. 15; Dkt. 23, pp. 19-20. "The

house was a duplex and the music was coming from the unit at the back of the house [, (Unit B)]." *Id*. The officers "entered through a pedestrian gate and walked down a long walkway to reach the door of the unit playing music." *Id*. There was a large picture window next to the front door of Unit B. *Id*. at ¶ 7; Dkt. 21, Hayes Dec., ¶ 8. The officers could see the lights were on in the home and on the back patio of the home. Dkt. 20, Welsh Dec., ¶ 7. The entire inside of the house was visible; Office Welsh could see the living room, a hallway going back to what appeared to be the bedrooms, the kitchen, and part of the back patio. Dkt. 20, p. 14; *see also* Dkt. 21, Hayes Dec., ¶¶ 8-9.

At this point in the evening, the evidence is in dispute regarding the events which transpired prior to Defendant Welsh shooting Plaintiff.

A. <u>Defendants' Evidence</u>

Defendants' evidence shows Defendant Welsh and Officer Hayes, who were both in police uniform, stood in front of the large window next to the front door so the occupants could see they were police officers and not be startled. Dkt. 20, Welsh Dec., ¶ 8; Dkt. 20, p. 13; Dkt. 21, p. 10. Defendant Welsh testified he knocked on the metal storm door frame and said "Tacoma Police." Dkt. 20, Welsh Dec., ¶ 8. Defendant Welsh did not hear anything immediately after he knocked and announced the officers' presence. *Id*. However, a few seconds later, Stephen came into the living room, looked towards the back patio, and then made brief eye contact with Defendant Welsh. *Id*. Defendant Welsh continued to knock on the door and, at one point, announced, "Tacoma Police. You just need to turn down your music." Dkt. 20, Welsh Dec., ¶ 9. While Stephen appeared to react to the officers' presence when he first entered the living room, Defendant Welsh did not feel threatened. Dkt. 20, p. 15.

Officer Hayes testified that Stephen looked at the officers and Defendant Welsh knocked and said "Tacoma Police" while Stephen was in the room. Dkt. 21, Hayes Dec., ¶ 9; Dkt. 20, p. 11. Stephen had a blank stare, or "thousand yard stare," and did not acknowledge the officers. Dkt. 21, Hayes Dec., ¶ 9. Officer Hayes stated that a "thousand yard stare" is usually associated with "PCP, hallucinogens," and, in her training, officers cannot negotiate with an individual exhibiting a "thousand yard stare." Dkt. 21, p. 15. Stephen then walked back towards the kitchen and the sliding door that provided access to the back patio. Dkt. 21, Hayes Dec., ¶ 9; Dkt. 20, Welsh Dec., ¶ 10; Dkt. 20, p. 15.

After Stephen walked away, both Defendant Welsh and Officer Hayes noticed "a firearm sitting on the coffee table, with two magazines right next to it." Dkt. 20, Welsh Dec., ¶ 10; Dkt. 21, Hayes Dec., ¶ 9. Defendant Welsh stated the gun appeared to be a Kimber 1911 with a dark metallic finish; it was in a small holster, like a pressure holster. Dkt. 20, p. 15. Defendant Welsh did not consider the mere presence of the firearm to be a threat. Dkt. 20, Welsh Dec., ¶ 10; Dkt. 20, p. 15.

Defendant Welsh knocked an additional time and Stephen turned back towards the living room. Dkt. 21, Hayes Dec., ¶ 10. Defendant Welsh, who was standing at least partially in front of the window, flashed his flashlight on himself briefly to show he was a police officer. Dkt. 20, Welsh Dec., ¶ 11. Stephen looked at the officers again; he now looked frantic, angry, intense, and crazed. *Id.*; Dkt. 20, p. 16. Stephen made a gesture and said something to the effect of "oh, okay" or "oh, no, your (sic) gonna get it." Dkt. 20, Welsh Dec., ¶ 11. Stephen picked up speed, moving towards the gun. Dkt. 21, p. 12. He fixated on the gun and grabbed for it. Dkt. 20, Welsh Dec., ¶ 11; Dkt. 21, Hayes Dec., ¶ 10. Defendant Welsh stated that he was "immensely fearful" Stephen would begin shooting the officers through the door of the house. Dkt. 20, p. 17.

The officers were in a terrible tactical position. Dkt. 20, Welsh Dec., ¶ 12. The coffee table, where the gun was located, was very close to the officers. *Id*. The officers could not retreat the way they had come because it was a long walkway with no cover and they would have their backs to Stephen. *Id*.; *see also* Dkt. 20, p. 16. Thus, when Stephen reached for the gun, both Defendant Welsh and Officer Hayes ran to the west side of the house and into the backyard. Dkt. 20, Welsh Dec., ¶ 11; Dkt. 21, Hayes Dec., ¶ 11. There was no doubt in Officer Hayes's mind that the officers were in danger when they ran around the northwest corner of the house into the backyard. Dkt. 28-2, p. 10 (Hayes Depo., p. 31).

Officer Hayes ran to take cover at the southwest corner of the house. Dkt. 28-2, p. 10 (Hayes Depo., p. 31). When Officer Hayes arrived at the southwest corner she engaged with a male wearing a white shirt. Dkt. 21, Hayes Dec., ¶ 12. She directed him to stay where he was and show her his hands. *Id*. Officer Hayes heard Stephen say, "I'm going to fucking kill you guys" and the male in the white shirt ran into the house through the back patio door. *Id*.

After Defendant Welsh ran around the northwest corner of the house, he began walking backwards towards the southwest corner of the house when he heard Stephen slam the front door open and heard Officer Hayes contact someone from her location near the southwest corner of the house. Dkt. 20, Welsh Dec., ¶ 13; Dkt. 20, p. 17. Defendant Welsh did not know if the individual Officer Hayes was engaged with was collaborating with Stephen or just someone in the backyard. Dkt. 20, p. 18. When Defendant Welsh reached the southwest corner of the house, he attempted to use as much of the corner of the house as he could to shield Officer Hayes from Stephen. Dkt. 20, p. 18. Defendant Welsh saw Stephen peer around the northwest corner of the house like he was looking for the officers with his gun out at "low ready." Dkt. 20, Welsh Dec., ¶ 13; Dkt. 20, p. 18. Defendant Welsh could see the gun in Stephen's right hand. Dkt. 20, p. 18.

Defendant Welsh was repeatedly screaming, "Tacoma Police! Drop your gun!" Dkt. 20, Welsh Dec., ¶ 13.

Defendant Welsh's head was sticking out from behind the southwest corner of the house and Stephen looked right at him. Dkt. 20, p. 18. Stephen disappeared around the northwest corner of the house and said something like "I'm going to get you!" or "I'm going to fucking kill you guys." Dkt. 20, Welsh Dec., ¶ 13; Dkt. 21, Hayes Dec., ¶ 12. Stephen then came directly around the northwest corner of the house with his gun raised and aimed at Defendant Welsh, who believed Stephen was coming to shoot the officers. Dkt. 20, Welsh Dec., ¶ 13; *see also* Dkt. 20, pp. 18-19. Officer Hayes heard Defendant Welsh say "Drop your weapon. Drop your weapon" and then heard Defendant Welsh fire his weapon several times. *Id*.

Defendant Welsh dropped his flashlight and fired four or five shots at Stephen. Dkt. 20, Welsh Dec., ¶ 13; Dkt. 20, p. 18. He stopped for a "split second," saw that Stephen was not incapacitated, still holding his gun in his left hand three quarters of the way up, and facing the officers. Dkt. 20, Welsh Dec., ¶ 13; Dkt. 20, pp. 18-19. Defendant Welsh fired a second volley of shots until Stephen fell to the ground. Dkt. 20, Welsh Dec., ¶ 13; Dkt. 20, pp. 18-19. Stephen's gun was "recovered with the safety off, in firing configuration with the hammer cocked and a round in the chamber," indicating Stephen was intent to fire the weapon. Dkt. 23, p. 26.

During the shooting, the officers were located near the southwest corner of the house and were standing close enough that the casings from Defendant Welsh's weapon hit Officer Hayes on the shoulder. Dkt. 20, Welsh Dec., ¶ 21; Dkt. 21, Hayes Dec., ¶ 12; Dkt. 28-2, p. 13 (Hayes Depo., p. 34); *see also* Dkt. 20, p. 17. Additionally, Defendants' evidence shows Defendant Welsh knocked and announced the officers probably four different times between the time the officers arrived at the home and when Stephen grabbed his gun. Dkt. 20, Welsh Dec., ¶ 9. There

is also evidence showing Andrew Blinn, one of Stephen's roommates who was present that evening, stated "he knew that Officer Hayes and Officer Welsh were police officers, and that he didn't know why [Stephen] didn't also know this." Dkt. 23, p. 24.

Defendants submitted an expert report stating that when Stephen armed "himself with a semi-automatic pistol" and moved "aggressively towards the officers," his actions constituted attempted assault in the first degree. Dkt. 23, p. 22. Additionally, Stephen's actions of moving toward the officers and raising the weapon met the elements of attempted assault in the first degree or attempted murder in the second degree. Dkt. 23, p. 24.

After the shooting occurred, Defendant Patterson, a police officer with the Tacoma Police Department, contacted the occupants in the other half of the duplex, Unit A. Dkt. 22, Patterson Dec., ¶¶ 2, 4. The occupants, Phil and Beverly Cunningham, are Stephen's parents. *See id*. at ¶ 5. Defendant Patterson initially asked the Cunninghams to move away from the wall shared with Unit B for their safety. *Id*. There was a concern there were individuals still inside Unit B who were not responding to the police. *Id*. at ¶ 4. Defendant Patterson was talking to the Cunninghams through the open front door when he was directed to obtain information from them about the occupants of Unit B. *Id*. at ¶ 6. Defendant Patterson does not recall if a sergeant or another officer asked him to obtain information from the Cunninghams. *Id*. While speaking through the open door, Mrs. Cunningham invited Defendant Patterson into the home. *Id*. at ¶ 7. Defendant Patterson does not recall if he asked if he could come in or if she "just invited" him inside; however, he does recall Mrs. Cunningham being concerned about leaving the door open due to the cool air outside. *Id*. Defendant Patterson entered the home and the door was closed behind him and remained closed while he was inside. *Id*.

The Cunninghams provided Defendant Patterson with information about the occupants of Unit B, including the fact that there were other weapons inside Unit B, which led Tacoma Police supervisors to direct SWAT to respond to the scene. *Id.* at ¶ 9; Dkt. 19, p. 75 (police had evidence that there were numerous weapons and possibly an individual who suffered from PTSD in the home). After Defendant Patterson learned that SWAT was being called, non-party Sergeant Verone instructed Defendant Patterson to ask the Cunninghams to leave Unit A for their safety. Dkt. 22, Patterson Dec., ¶ 10. Defendant Patterson instructed the Cunninghams to dress warmly and escorted them from the residence. *Id.* Defendant Patterson later learned the Cunninghams had cameras outside the residence and there was concern the feed could be seen inside Unit B, allowing the occupants to see the police. *Id.* at ¶ 13. The Cunninghams informed Defendant Patterson that the camera feed was only visible in Unit A. *Id.* The police did not re-enter Unit A to check the camera feed. *Id.* Defendant Patterson did not re-enter Unit A, did not search Unit A, and did not see the video feed or access the video cameras or equipment. *Id.* at ¶ 16.

B. <u>Plaintiffs' Evidence</u>

Plaintiffs' evidence shows that on the evening of May 10, 2015, Stephen and Mr. Blinn were sitting on the back patio of Unit B listening to music. *See* Dkt. 30, Blinn Dec., ¶¶ 2-3. They went into the home through the back door and saw multiple flashlights moving on the outside of the living room window. *Id.* at ¶¶ 8-9. Mr. Blinn saw at least two flashlights moving, but he could not see how many individuals were outside the home. *Id.* at ¶¶ 10-11. Mr. Blinn never heard anyone announce themselves. *Id.* at ¶ 12.[1] Stephen grabbed his pistol off the coffee table,

---

[1] The Court notes Mr. Blinn testified that neither he nor Stephen heard anyone announce themselves; however, Mr. Blinn provides no evidence explaining how he knew what Stephen did or did not hear. *See* Dkt. 30, Blinn Dec., ¶ 12. Therefore, the Court finds Mr. Blinn does not have knowledge of what Stephen heard.

opened the front door, and said, "Really? Who the fuck are you?" *Id*. at ¶¶ 13-14. "There was no response from the individuals outside." *Id*. at ¶ 14. Stephen then walked out the door and turned left; Mr. Blinn followed him out. *Id*. at ¶ 15. As Mr. Blinn took his first step outside the door, he heard approximately six gunshots and dove in the opposite direction. *Id*. at ¶ 16. Stephen was laying twenty feet away from Mr. Blinn. *Id*. at ¶17. Mr. Blinn heard Stephen struggling for breath, then silence, then more gunshots. *Id*. "After the last gunshot, [Mr. Blinn] heard police yelling. Up until that point[, Mr. Blinn] didn't know who was shooting at [himself and Stephen.]" *Id*. Mr. Blinn testified that he never heard an order to drop the gun from the police, who only identified themselves after they fired multiple shots at Stephen. *Id*. at ¶ 18.

After the shooting, Phil was standing at the door of his home and Defendant Patterson forced Phil back into his home. Dkt. 28-1, p. 6 (Phil Depo., pp. 50-52). Defendant Patterson then entered Phil's home without being invited and without a warrant. *Id*. at p. 7 (Phil Depo., p. 53). Defendant Patterson moved the Cunninghams to the back bedroom so they would be away from the windows in the living room because there might be gunshots. *Id*. at p. 9 (Phil Depo., p. 63). Defendant Patterson then told the Cunninghams they had to leave the home because it was going to be searched by the police. *Id*. at p. 8 (Phil Depo., p. 59). Phil saw flash bulbs going off in his bedroom at 3:30 a.m., so he knew the police were in his home taking pictures. *Id*. at p. 12 (Phil Depo., pp. 86-87). Around 6:00 a.m., Phil and his wife were allowed to return to the home to get medications. *Id*. at pp. 10-11 (Phil Depo., pp. 67, 73). No police were in the home at that time. *Id*. at p. 10 (Phil Depo., p. 67). The Cunninghams were allowed back in their home around 12:20 p.m. on May 11, 2015. *See id*. at p. 11 (Phil Depo., p. 75).

Plaintiffs also submitted declarations from five neighbors who lived near the scene of the shooting. *See* Dkt. 29, Robinson Dec.; Dkt. 31, Sprinkle Dec.; Dkt. 32, Fivecodes Dec.; Dkt. 33,

Sears Dec.; Dkt. 34, Renich Dec.; Dkt. 35, Walter Dec. The neighbors all state that they heard

the gunshots, but did not hear anyone identify themselves prior to the shooting. *See* Dkt. 29,

Robinson Dec., ¶ 7; Dkt. 31, Sprinkle Dec., ¶ 7; Dkt. 32, Fivecodes Dec., ¶ 5; Dkt. 33, Sears

Dec., ¶ 4; Dkt. 34, Renich Dec., ¶5; Dkt. 35, Walter Dec., ¶ 6.

## IV.    DISCUSSION

In the Motion, Defendants assert there is no genuine issue of material fact regarding: (1)

Defendant City of Tacoma's liability; (2) punitive damages; (3) Defendant Welsh's use of deadly

force; and (4) Defendant Patterson's entry into Phil's home. Dkt. 18.

### A.    Defendant City of Tacoma and Punitive Damages

Defendants assert Plaintiffs cannot establish excessive use of force or unlawful entry

claims against Defendant City of Tacoma. *See* Dkt. 18, pp. 16-18, 23. Defendants also contend

Plaintiffs have not established that there is a basis for punitive damages in this case. *Id*. at pp. 23-

24. In their Response to the Motion, Plaintiffs state they dismiss any claim against Defendant

City of Tacoma "based on its policy, custom, failure to train, or ratification." Dkt. 27, p. 19.

Plaintiffs also concede there is no evidence showing punitive damages are appropriate in this

case. *Id*. at p. 21. Based on Plaintiffs' Response, the Court dismisses Defendant City of Tacoma

and any claim for punitive damages.

### B.    Use of Force

Defendants assert the excessive force claim alleged against Defendant Welsh must be

dismissed because Defendant Welsh's use of deadly force was objectively reasonably. Dkt. 18.

Further, even if Defendant Welsh's actions were not objectively reasonable, he is entitled to

qualified immunity. *Id*. "[G]overnment officials performing discretionary functions [are entitled

to] a qualified immunity, shielding them from civil damages liability as long as their actions

1  could reasonably have been thought consistent with the rights they are alleged to have violated."

2  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citations omitted). "Qualified immunity

3  balances two important interests—the need to hold public officials accountable when they

4  exercise power irresponsibly and the need to shield officials from harassment, distraction, and

5  liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231

6  (2009). "In determining whether an officer is entitled to qualified immunity, we consider (1)

7  whether there has been a violation of a constitutional right; and (2) whether that right was clearly

8  established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112,

9  1116 (9th Cir. 2014) (citing *Pearson*, 555 U.S. at 232).

10        1. *Constitutional Violation*

11        First, the Court must determine whether a constitutional violation occurred. Here,

12  Plaintiffs allege Defendant Welsh violated Stephen's Fourth Amendment rights when he failed to

13  warn Stephen prior to using deadly force. Dkt. 1-1, 27.

14        In the Ninth Circuit, courts "analyze all claims of excessive force that arise during or

15  before arrest under the Fourth Amendment's reasonableness standard[.]" *Coles v. Eagle*, 704

16  F.3d 624, 627 (9th Cir. 2012) (*citing Graham v. Connor*, 490 U.S. 386 (1989)). "[T]he

17  'reasonableness' inquiry in an excessive force case is an objective one: the question is whether

18  the officers' actions are 'objectively reasonable' in light of the facts and circumstances

19  confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at

20  397.

21        Factors for evaluating reasonableness include, but are not limited to: (1) the
      severity of the crime at issue; (2) whether the suspect posed an immediate threat

22        to the safety of the officers or others; and (3) whether the suspect actively resisted
      arrest or attempted to escape. Other relevant factors include the availability of less

23        intrusive alternatives to the force employed, whether proper warnings were given
      and whether it should have been apparent to officers that the person they used

24

force against was emotionally disturbed. Of all these factors, the most important one is whether the suspect posed an immediate threat to the safety of the officers or others.

*S.B. v. City of San Diego*, 864 F.3d 1010, 1013-14 (9th Cir. 2017) (internal citations and quotations omitted).

The Ninth Circuit has "determine[d] that [ ] warnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning or the failure to do so is a factor to be considered[.]" *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001). However, "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005). As the Ninth Circuit has summarized, "[l]aw enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision in hindsight." *Id*. at 396 (*citing Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

In determining whether summary judgment is appropriate, the Court must consider all facts in dispute in the light most favorable to Plaintiffs, the nonmoving party. *See Glenn v. Washington County*, 673 F.3d 864, 870 (9th Cir. 2011). Here, the evidence viewed in the light most favorable to Plaintiffs shows Stephen was sitting on the back patio of his home with Mr.

Blinn. They walked into the house through the sliding glass door and saw flashlights shining through the front window of the home, indicating there were people outside the front door. Stephen grabbed his gun, opened the front door, and said, "Really, who the fuck are you?" While Defendant Welsh said he was repeatedly saying, "Tacoma Police. Drop your gun," Mr. Blinn testified he did not hear a response. Stephen walked outside the door and was shot within a few seconds.

In the few moments between when Stephen walked outside the front door of his home and when he was shot by Defendant Welsh, the undisputed evidence shows Stephen peered behind the northwest corner of his home with his gun at "low ready." He went back behind the northwest corner of the house and within a few seconds stepped out completely from behind the house and started toward Defendant Welsh with his gun raised and pointed at Defendant Welsh. During this time, Officer Hayes heard Stephen say, "I'm going to fucking kill you guys" and both Defendant Welsh and Officer Hayes state Defendant Welsh yelled "Drop your weapon."

In assessing the *Graham* balancing test, the Court finds that, first, the crime occurring during the shooting was severe. At the time Defendant Welsh initially made contact at Unit B, Defendant Welsh stated it was a very simple call to request the music be turned down. Dkt. 20, p. 15; Dkt. 23, pp. 19-20. However, once Stephen grabbed his weapon, pursued the officers, and said, "I'm going to fucking kill you guys" or "I'm going to get you," the severity of the crime escalated. When Stephen armed "himself with a semi-automatic pistol" and moved "aggressively towards the officers," his actions constituted attempted assault in the first degree. Dkt. 23, p. 22. Additionally, Stephen's actions of moving toward the officers and raising and pointing the gun at Defendant Welsh met the elements of attempted assault in the first degree or attempted murder in the second degree. *See* Dkt. 23, p. 24. The Court finds the undisputed evidence shows that, at the

time of the shooting, the crime at issue was severe. Thus, the first factor weighs in favor of finding Defendant Welsh's actions were objectively reasonable.

Second, there is evidence showing Stephen presented an immediate threat to Defendant Welsh and Officer Hayes. The Court notes that whether Stephen posed an "immediate threat to the safety of the officers or others" is "the most important single element of the three specified factors" of the *Graham* test. *Chew v. Gates,* 27 F.3d 1432, 1441 (9th Cir. 1994). Here, the evidence viewed in the light most favorable to Plaintiffs shows Stephen saw people outside his living room by the front door. Stephen, looking frantic, angry, intense, and crazed, quickly grabbed the gun off the coffee table near the front door. Defendant Welsh and Officer Hayes ran from the front door of Unit B when they saw Stephen grab the gun because they feared they were in immediate danger of being shot. The officers could not tactically retreat the way they had come because it was a long walkway with no cover and they would have their backs to Stephen, an armed individual. Thus, when Stephen reached for the gun, both Defendant Welsh and Officer Hayes ran to the west side of the house and into the backyard. Defendant Welsh was immensely fearful that Stephen would shoot the officers through the front door. Further, there was no doubt in Officer Hayes's mind that the officers were in danger when they ran into the backyard.

Stephen walked out the front door, which is where the officers were located, and said, "Really, who the fuck are you?" Defendant Welsh and Officer Hayes took cover near the southwest corner of the house. Stephen peered around the northwest corner of the house towards the officers with his gun at "low ready." Defendant Welsh was, at least, partially visible to Stephen. Stephen stepped back behind the northwest corner of the house, out of Defendant Welsh's view. He then completely stepped out from behind the northwest corner of the house and started toward Defendant Welsh with his gun raised and pointed at Defendant Welsh. During

this time, Officer Hayes heard Stephen say, "I'm going to fucking kill you guys" and Defendant Welsh heard Stephen say "I'm going to get you." Evidence also shows Stephen's gun was "recovered with the safety off, in firing configuration with the hammer cocked and a round in the chamber," indicating Stephen was intent to fire the weapon. Thus, the evidence, viewed in the light most favorable to Plaintiffs, shows Stephen posed an immediate threat to Defendant Welsh and Officer Hayes. This factor, the most important factor, weighs in favor of finding Defendant Welsh's actions were objectively reasonably.

Third, the evidence shows Defendant Welsh did not warn Stephen prior to using deadly force. Plaintiff asserts that this case hinges on evidence showing Defendant Welsh failed to identify himself or warn Stephen before he used deadly force. *See* Dkt. 27. Officers are only required to give a warning "where feasible." *Tennessee v. Garner*, 471 U.S. 1, 12 (1985). "Verbal warnings are not feasible when lives are in immediate danger and every second matters." *Estate of Martinez v. City of Federal Way*, 105 F. App'x 897, 899 (9th Cir. 2004). However, when a suspect does not pose an immediate threat to the lives of officers or others, a warning is feasible. *See Deorle*, 272 F.3d at 1284.

In this case, viewing the evidence in the light most favorable to Plaintiffs, Defendant Welsh and Officer Hayes testified that Defendant Welsh identified himself as a police officer and directed Stephen to drop his weapon.[2] Importantly, there is no evidence showing Defendant Welsh provided any warning that he was going to use deadly force. However, it is undisputed that the events unfolded very quickly from the moment Stephen grabbed the gun until Defendant Welsh fired his weapon. Mr. Blinn testified it happened in a matter of seconds. At the time of the

---

[2] The Court does note the record contains conflicting information regarding whether Mr. Blinn was aware Defendant Welsh and Officer Hayes were police officers. *See See* Dkt. 23, p. 24; Dkt. 30, Blinn Dec. However, the Court will view Mr. Blinn's testimony in the light most favorable to Plaintiffs, which shows Mr. Blinn was not aware Defendant Welsh and Officer Hayes were police officers until after the shooting.

shooting, Stephen had his gun raised, was moving towards the officers, and had stated he was going to kill them or "get" them. The officers were trapped in the fenced-in backyard. Both officers believed they were in imminent danger. Officer Welsh heard Officer Hayes engaged with another individual in the backyard. The individual did not follow Officer Hayes commands, and it was unclear to Defendant Welsh if this individual was collaborating with Stephen. The undisputed evidence shows the situation escalated quickly, and Stephen's actions, including verbally threatening to kill the officers and walking towards the officers with his gun pointed at them, created a situation that put the officers' lives in immediate danger where every second mattered.

The Court notes there is evidence showing Mr. Blinn and neighbors did not hear Defendant Welsh identify himself as a police officer. Mr. Blinn's testimony, viewed in the light most favorable to Plaintiffs, shows that he did not hear the police identify themselves until after the gunfire stopped. Furthermore, there is testimony from several neighbors stating they did not hear anyone identify themselves prior to hearing gunshots. Significantly, there is no evidence showing the neighbors were close enough to hear Defendant Welsh identify himself or were listening for people to identify themselves until after they heard gunshots. Regardless, this evidence is not dispositive of the issue of whether Defendant Welsh provided a warning prior to using deadly force. As the undisputed evidence shows, Defendant Welsh could not have feasibly provided a warning prior to using deadly force.

Plaintiffs argue that because Defendant Welsh testified he was able to repeatedly state, "Drop your weapon," it was feasible for him to warn Plaintiff that he would be using deadly force. Dkt. 27, pp. 15-19. However, as stated above, the Ninth Circuit has held "[v]erbal warnings are not feasible when lives are in immediate danger and every second matters." *Estate*

*of Martinez*, 105 F. App'x at 899. Here, the undisputed evidence shows Stephen was armed, verbally threatened to kill the officers, and was moving towards the officers with a gun pointed at Defendant Welsh, who was visible to Stephen. Regardless of whether there was literally enough time for Defendant Welsh to warn Stephen that he would be using deadly force, the evidence shows that it was not feasible, under the law, for Defendant Welsh to provide a verbal warning prior to using deadly force in this case. Therefore, Plaintiffs' argument that Defendant Welsh may have had enough time in terms of literal seconds to issue a verbal warning does not overcome Defendants' summary judgment showing. Accordingly, the third factor weighs in favor of finding Defendant Welsh's actions were objectively reasonable.

For the above stated reasons, and consistent with the *Graham* factors, the Court finds the evidence, viewed in the light most favorable to Plaintiffs, shows Defendant Welsh's conduct was objectively reasonable.

As the Court finds Defendant Welsh did not violate Stephen's Fourth Amendment rights, Defendant Welsh is entitled to qualified immunity. *See Corrales v. Impastato*, 650 F. App'x 540 (9th Cir. 2016) (finding the officer, who did not issue a warning, did not violate the plaintiff's Fourth Amendment rights when the evidence showed the plaintiff rushed toward the officer with his hand positioned in a way that made the officer believe the plaintiff had a gun); *Penley v. Eslinger*, 605 F.3d 843, 854 n. 6 (11th Cir. 2010) (holding that when an officer ordered an armed man to "put down the gun," he did not issue a "warning" under *Garner*, but he was justified in firing because "such a warning might easily have cost the officer his life").

2. *Clearly Established Law*

The Court has determined the undisputed evidence shows Defendant Welsh's actions did not result in a violation of Stephen's Fourth Amendment rights. Therefore, there is no genuine

issue of fact regarding the first prong of qualified immunity. As such, the Court need not determine if the second prong of qualified immunity has been met. However, the Court also finds there was no clearly established law at the time of the shooting that put Defendant Welsh on notice that his actions violated Stephen's rights.

Under the second prong of qualified immunity, the Court must determine "whether the right at issue was clearly established such that a reasonable officer would have understood his actions were unlawful." *Hughes v. Kisela*, 841 F.3d 1081, 1088 (9th Cir. 2016). While the Supreme Court's case law "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal citations omitted). "Clearly established law" should not be defined at a high level of generality; it must be "particularized" to the facts of the case. *See id.*; *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *Anderson*, 483 U.S. at 640. To determine "clearly established law," the Court should first look to binding precedent. *Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013). "Absent binding precedent, [the Court] look[s] to all available decisional law, including the law of other circuits and district courts, to determine whether the right was clearly established." *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996); *see Elder v. Holloway*, 510 U.S. 510, 516 (1994) (the Court should consider all relevant precedents); *Dunn v. Castro*, 621 F.3d 1196, 1203 (9th Cir. 2010) ("In determining whether a right is clearly established, we may also look to precedent from other circuits.").

At the time of the shooting, on May 10, 2015, it was clearly established that "[l]aw enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat

of injury to persons." *Harris*, 126 F.3d at 1201. Additionally, it was clearly established that officers are only required to give a warning "where feasible." *Garner*, 471 U.S. at 12.

Here, the situation resulting in Defendant Welsh's use of force escalated quickly. At the time of the shooting, Stephen verbally threatened to kill Defendant Welsh and Officer Hayes and was walking toward the officers with his gun pointed at Defendant Welsh. Defendant Welsh and Officer Hayes were trapped in a small fenced-in backyard without means to escape. The parties do not cite to, nor does the Court find, any precedent establishing that Defendant Welsh's conduct under these circumstances was unreasonable "beyond debate." *See City & County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1774 (2015). Therefore, Defendant Welsh is also entitled to qualified immunity under the "clearly established" prong. *See Flores-Haro v. Slade*, 686 F. App'x 454, 456 (9th Cir. 2017) (finding officers were entitled to qualified immunity under the second prong where officers shot the plaintiff multiple times after the plaintiff confronted the shadowy figures he saw circling his home. The plaintiff was armed when he was shot, but viewing the evidence in the light most favorable to him, he never pointed his gun at the officers or fired it and the officers never issued a warning).[3]

3. *Conclusion*

Viewing the evidence in the light most favorable to Plaintiff, the undersigned finds there are no genuine issues of material fact regarding whether Defendant Welsh's use of deadly force was excessive in violation of the Fourth Amendment. Further, even if Defendant Welsh's conduct was objectively unreasonable, there was no clearly established law at the time of shooting that would have put Defendant Welsh on notice that his conduct violated Stephen's

---

[3] Factual findings regarding the lack of warning are detailed in the district court's decision. *See Flores-Haro v. Slade*, 160 F. Supp. 3d 1231, 1233 (D. Or. 2016) ("Plaintiffs contend the shooting was without warning, and the officers never identified themselves.").

right to be free from excessive force. Accordingly, the Court finds Plaintiffs have not overcome

Defendants' summary judgment showing as to the excessive force claim alleged against

Defendant Welsh.

### C.  Warrantless Entry

Next, Plaintiffs allege Defendant Patterson unlawfully entered Phil's home immediately

after the shooting. Dkt. 1-1. "It is a basic principle of Fourth Amendment law that searches and

seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah*

*v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotations omitted, citations omitted). The warrant

requirement is, however, subject to exceptions. *Id*.; *see Flippo v. West Virginia*, 528 U.S. 11, 13

(1999); *Katz v. United States*, 389 U.S. 347, 357 (1967). "[W]arrants are generally required to

search a person's home or his person unless 'the exigencies of the situation' make the needs of

law enforcement so compelling that the warrantless search is objectively reasonable under the

Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-394 (1978).

"[L]aw enforcement officers may enter a home without a warrant to render emergency

assistance to an injured occupant or to protect an occupant from imminent injury." *Stuart*, 547

U.S. at 403; *Mincey*, 437 U.S. at 392; *Georgia v. Randolph*, 547 U.S. 103, 117 (2006). "Because

of law enforcement officers' role as community caretakers, '[t]he emergency doctrine allows

[them] to enter and secure premises without a warrant when they are responding to a perceived

emergency.'" *United States v. McKee*, 157 F. Supp. 3d 879, 895 (D. Nev. 2016) (quoting *United*

*States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005)). For a warrantless search under the

emergency doctrine to be justified, the following factors must be met: "(1) The police must have

reasonable grounds to believe that there is an emergency at hand and an immediate need for their

assistance for the protection of life or property;" and (2) "There must be some reasonable basis,

1  approximating probable cause, to associate the emergency with the area or place to be searched."

2  *Stafford*, 416 F.3d at 1073-74.[4]

3       First, the evidence viewed in the light most favorable to Plaintiffs shows Defendant

4  Patterson entered Phil's home because Defendant Patterson believed there was an immediate

5  need to assist the Cunninghams for the protection of their life. Defendant Patterson entered Phil's

6  home immediately after the shooting. The police were still attempting to secure residents inside

7  Unit B who were not complying with police commands. Defendant Patterson moved the

8  Cunninghams to the bedroom of their home because he was concerned there may be additional

9  gunshots, which could enter their living room. After the Cunninghams were in the bedroom with

10  Defendant Patterson, Defendant Patterson learned that SWAT was responding to the scene and

11  instructed the Cunninghams to leave Unit A because it needed to be searched. After Defendant

12  Patterson escorted the Cunninghams from Unit A, he did not re-enter the unit. The evidence,

13  viewed in the light most favorable to Plaintiffs, shows Defendant Patterson entered Phil's home

14  in order to protect Phil from the immediate threat of additional gunshots while the police

15  attempted to secure the scene.

16       Second, there was a reasonable basis to associate the emergency with Phil's home. The

17  evidence shows the shooting occurred outside Unit B and Unit B is attached to Phil's home (Unit

18  A). Officers were attempting to secure a shooting scene. There were occupants in the Unit B who

19  were not responding to police commands and there was evidence of additional weapons in Unit

20  B. It was possible for bullets to travel through the living room window or wall of Phil's home.

21  Therefore, there was a reasonable basis to associate the emergency with Phil's home.

22

23  _____

24  [4] In *Stafford*, the Ninth Circuit also required inquiry into the motivation of the officer. *See id.* at 1073.
   However, in *Brigham City*, the Supreme Court held the officer's subjective motivation is irrelevant. 547 U.S. at 404.

1       Plaintiffs agree Defendant Patterson was "certainly within his Constitutional right to

2 clear" the Cunninghams from their home to protect them from the emergency. Dkt. 27, p. 20.

3 However, Plaintiffs assert Defendant Patterson had no reason to enter Phil's home because the

4 emergency was not in their home; it was next door, in Unit B. *Id.* at pp. 20-21. Plaintiffs,

5 however, cite to no evidence to support this argument.

6       As previously discussed, the undisputed evidence shows, at the time Defendant Patterson

7 entered Phil's home, there was an ongoing situation wherein, following a shooting, the occupants

8 of Unit B (the apartment attached to Phil's home) were not complying with police commands.

9 There is no evidence showing it was unreasonable for Defendant Patterson to attempt to keep

10 Phil safe in his home before escorting him away from an active shooting situation. Therefore,

11 Plaintiffs have failed to overcome Defendants' showing that an emergency situation created an

12 exception to the Fourth Amendment warrant requirements allowing Defendant Patterson to

13 lawfully enter Phil's home.

14       The Court also notes Phil testified that he saw flashbulbs in his home around 3:30 a.m.

15 However, Phil did not testify that he saw Defendant Patterson in his home and there is no

16 evidence showing Defendant Patterson re-entered Phil's home after he escorted the

17 Cunninghams from their home. Thus, the fact that Phil saw flashbulbs in his home around 3:30

18 a.m. does not create a genuine issue of material fact regarding whether Defendant Patterson

19 violated Phil's Fourth Amendment rights.

20       In summation, considering the factors, the evidence viewed in the light most favorable to

21 Plaintiffs shows Defendant Patterson entered Phil's home without a warrant under the emergency

22 exception doctrine. Therefore, there is no genuine issue of material fact regarding whether

23 Defendant Patterson violated Phil's constitutional rights when he entered Phil's home without a

24

warrant. *See United States v. Escalante*, 17 F. App'x 635, 636 (9th Cir. 2001) (finding the emergency exception applied when gun shots had been reported by a neighbor outside of the searched home). Accordingly, Plaintiffs have failed to overcome Defendants' summary judgment showing regarding the claim alleged against Defendant Patterson.

### D.  Unserved Defendants

Plaintiffs bring claims against Officers John and Jane Doe 1-5. *See* Dkt. 1-1. The time for serving the summonses and Complaint expired on December 29, 2016, 90 days after the Complaint was filed in this Court, and no proof of service has been filed regarding the Doe defendants. *See* Dkt. 1; Fed. R. Civ. P. 4(l), 4(m). Further, the Doe defendants have not been identified and no attorney has entered an appearance on their behalf. Unless a plaintiff can show good cause for his failure to serve, the court shall dismiss the action without prejudice as to that defendant or shall extend the time for service. Fed. R. Civ. P. 4(m). Plaintiffs have not showed good cause for the failure to serve or requested an extension of time to serve the Doe defendants. Accordingly, the Doe defendants are dismissed from this case without prejudice.

## V.  CONCLUSION

The Court concludes the evidence, viewed in the light most favorable to Plaintiffs, shows no genuine issues of material fact exist in this case. Therefore, Plaintiffs have not overcome Defendants' summary judgment showing. Accordingly, Defendants' Motion for Summary Judgment is granted, the Doe defendants are dismissed, and this case is closed.

Dated this 7th day of March, 2018.

David W. Christel
United States Magistrate Judge